RECEIVED
COURT PRO SE OFFICE

2014 FEB 11   P 4: 07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED #: 2 11 14

———————————————————————— X

GERARD CORSINI,

                           Plaintiff,

-against-

DANIEL BRODSKY, THOMAS BRODSKY, THE
BRODSKY ORGANIZATION, LLC, 433 WEST
ASSOCIATES, LLC, URBAN ASSOCIATES, LLC,
MARGARET BERGIN O'CONNOR, LOUIS ZADRIMA,
JOSEPH PITRE, THE CITY OF NEW YORK, MAYOR
MICHAEL R. BLOOMBERG, FIRST DEPUTY MAYOR
PATRICIA E. HARRIS, POLICE COMMISSIONER
RAYMOND W. KELLY, COMMISSIONER KATHERINE
L. OLIVER, COMMISSIONER ROBERT LIMANDRI,
DEPUTY COMMISSIONER JOHN BATTISTA, DEPUTY
INSPECTOR ELISA A. COKKINOS, LIEUTENANT
HOULIHAN, DETECTIVE ERIC PATINO, OFFICER
RICHARD STELLMAN, DISTRICT ATTORNEY CYRUS
R. VANCE, JR., ASSISTANT DISTRICT ATTORNEYS
KAREN FRIEDMAN-AGNIFILO, NITIN SAVUR, JOHN
IRWIN, WILLIAM DARROW, LISA DELPIZZO AND
DANIEL GARNAAS-HOLMES, THE POLICE
DEPARTMENT OF THE CITY OF NEW YORK,
LIEUTENANT EDWARD LOSS OF THE NEW YORK
CITY FIRE DEPARTMENT, ELIZABETH MORGAN
AKA ELIZABETH MORGAN CARY, JONATHAN
CARY,  DANIEL J. MCKAY, AARON SHMULEWITZ,
BELKIN BURDEN WENIG & GOLDMAN, LLP, AND
JOHN DOES 1-25 AND JANE DOES 1-25,

                           Defendants.

———————————————————————— X

Civil Action No.:
13CV2587 (LTS)(MHD)

**FIRST AMENDED
COMPLAINT**

PLAINTIFF DEMANDS
A TRIAL BY JURY OF
ALL CLAIMS AND
ISSUES SO TRIABLE

Plaintiff, *pro se*, Gerard Corsini, as and for his First Amended Complaint in this

action, alleges on information and belief as follows:

### Parties, Jurisdiction, Venue and Summary of Claims

1. Plaintiff resides and, at all times material hereto, has resided at 433 W. 21st Street, in the City and County of New York (the "City") in which all of the conduct alleged herein took place and is suing pursuant to

(a) 42 U.S.C. §1983 and 1985 for damages against defendants, and each of them, for having committed and for having conspired to commit acts under color of state law with the intent and for the purpose of depriving plaintiff of established rights secured under the First, Fourth and Fourteenth Amendments of the Constitution of the United States, including in retaliation and punishment for the exercise of plaintiff's First Amendment rights, chilling same, including

(i) by a malicious, false arrest of plaintiff pursuant to an unconstitutional custom, practice and policy of defendant Bloomberg and the City described herein (the "Custom"), without any, much less probable cause, on April 18, 2012, by defendant Patino acting for the other City defendants on the advice of defendants Vance, Friedman-Agnifilo, Irwin, Savur, Darrow, DelPizzo and Garnaas-Holmes and importuned by defendants Cary and Morgan (aided and abetted by defendants Shumlewitz and Belkin, Burden, Wenig & Goldman (the "Belkin defendants")) based upon known insufficiency and the known unreliability and criminal false reporting of defendants Morgan and Cary with the aid and in conspiracy with the City defendants acting through, among others, defendants Cokkinos, Houlihan, Stellman, Patino, DelPizzo and Garnaas-Holmes as their agents and with their knowledge, approval and ratification in retaliation for plaintiff's

exercise of his First Amendment rights;

(ii)  by the siege, storming and breaching of plaintiff's apartment on July 18, 2012, in conspiracy with and aided and abetted by defendant Daniel Brodsky, defendant Thomas Brodsky and their defendant companies and employees acting as state actors in concert with the City defendants, including defendants Bloomberg, Kelly, Cokkinos, Houlihan, Stellman, Patino and Loss, for approximately three hours notwithstanding urgent, *direct pleas by plaintiff to defendants Bloomberg, Harris, Kelly,* Houlihan, Stellman, Patino and Loss to stop that siege and to get an arrest warrant based upon probable cause, offering to conclusively disprove the charges he knew to be false as vaguely stated as they were to him (which, in fact, he was and is able to do), with repeated loud banging on plaintiff's door and repeated threats to break it down and the unbearable leaning on plaintiff's buzzer, in an unconstitutional attempt, without a warrant, to effect the false arrest accomplished on July 25, 2012 in front of plaintiff's building (also in conspiracy and aided and abetted by the Brodsky defendants); the Brodsky defendants also acted pursuant to an on-going agreement between the Brodsky defendants, acting through defendants Pitre and O'Connor, and defendants Cary and Morgan (as established by defendant Morgan's testimony at trial) first entered into in November, 2010 and reaffirmed numerous times thereafter, including in June, 2011 and in July, 2012, to take all steps necessary to have plaintiff falsely arrested and evicted from his apartment owned by Brodsky defendants, including surveilling and stalking him to find any false pretext to falsely arrest or evict plaintiff and to cause him severe emotional distress, which it did, with all of said defendants on July 18, 2012, knowingly and deliberately putting plaintiff at risk of a heart attack, most particularly when defendant

Kelly allowed detective Patino, notwithstanding plaintiff's having requested that defendant Patino and everyone else stay away, in particular defendant Patino whose presence and outrageous conduct were the principal cause of plaintiff's extreme stress, to return to plaintiff's apartment door with defendant Loss, John Doe 1, defendant Pitre and numerous EMC and fire personnel and continue the siege in greater force, numbers and intensity in an attempt to cause plaintiff severe emotional stress and to put him at risk of a heart attack to have a pretext to break into his apartment to arrest him, which defendants Patino and Loss continually threatened (with defendants Houlihan and John Doe 1 participating) after having attempted by deceitful means to have plaintiff sign an authorization for medical treatment that would have allowed them to break down his door, when the form had been represented to be a *declination* of medical treatment that plaintiff was asked to sign near the "X", finally breaching the apartment by having defendant Pitre (with defendant Zadrima listening on defendant Pitre's cell phone and participating with the approval of the other Brodsky defendants, including Daniel and Thomas Brodsky and defendant O'Connor) put a key to plaintiff's apartment in the lock on his door and turn it, thereby entering/breaching plaintiff's apartment and causing him severe emotional distress, as intended;

(iii)  by a malicious, false arrest pursuant to the Custom and in retaliation for the exercise of plaintiff's First Amendment rights without any, much less probable cause, on July 25, 2012, importuned by defendants Cary and Morgan (aided and abetted by the Belkin defendants) based upon known insufficiency and the known criminal false reporting and unreliability of defendants Cary and Morgan with whom the City defendants had conspired and agreed to accomplish same, with the knowledge,

authorization, approval and ratification of defendants Bloomberg, Harris, Kelly,

Cokkinos, Houlihan and Stellman (all of whom were fully aware of said criminal false

reporting, of the past false arrests of plaintiff and of the insufficiency of the complaints

against plaintiff), on the advice of defendants Vance, Friedman-Agnifilo, Irwin, Savur,

Darrow, DelPizzo and Garnaas-Holmes (for whom Holmes acted with their full

knowledge and approval, including in the name of defendant Vance) and in conspiracy

with and aided and abetted by defendant Daniel Brodsky, defendant Thomas Brodsky and

their defendant companies and employees as state actors in concert with the City

defendants, including defendants Cokkinos, Houlihan, Stellman and Patino, with

defendant Pitre surveilling and stalking plaintiff for days when he walked his dog as

agreed with said defendants and reporting his movements to defendants Cokkinos,

Houlihan, Stellman and Patino, including defendant Pitre's following plaintiff out of the

building on July 25, 2012, after waiting for plaintiff to show up on the building's

surveillance camera, then going to his SUV and reporting plaintiff's movements to said

defendants, resulting in plaintiff's false arrest, including based upon perjury of defendant

Patino as to plaintiff's allegedly having resisted said false arrest, and his malicious

prosecution without probable cause after his hospitalization for a possible heart attack

before being taken to the Tombs, which hospitalization and threat to plaintiff's health

defendants had every reason to expect and intended out of malice and deliberate and

reckless disregard and indifference for plaintiff's health, safety and interests;

     (iv)  by malicious prosecutions and abusive judicial process and proceedings

commenced on April 18, 2012 and July 26, 2012, in retaliation for the exercise of

plaintiff's First Amendment rights without probable cause pursuant to the Custom, urged

and supported by defendants Cary and Morgan, terminated in plaintiff's favor, as to the

former prosecution, on or about December 19, 2013 (as to one count in the complaint)

and, as to the later prosecution, on or about August 19, 2013 (as to all counts in the

complaint) which involved the issuance of unnecessary and abusive protective orders for

the collateral purpose of preventing the exercise of plaintiff's First Amendment rights and

to force him to accept a plea with a permanent order precluding such exercise, all in

retaliation for the exercise of those rights, as well as burdensome court appearances that

were intended to and resulted in the serious deprivations of plaintiff's liberty and First

Amendment rights and had the additional intended, abusive and malicious collateral

purpose, in further denial of his rights to due process, together with the false arrests and

malicious prosecutions themselves, of making those deprivations, including arrests in

front of plaintiff's neighbors and (aa) the frightening hospitalization for an apparent heart

attack on July 25, 2012 after defendant Patino's deliberate delay in obtaining necessary,

medical care and (bb) as to the April 18, 2012 arrest, booking and holding in the Tombs

for an extended period in horrendous conditions so humiliating and unbearable, and the

subsequent and continuing requirements and deprivations of court appearances so

burdensome, that neither plaintiff nor any person of ordinary fortitude would refuse to

surrender his constitutional rights, including to due process, to the compounding abuses

thereof or fail to suffer severe emotional distress, as plaintiff did, but would accept a

dismissal conditioned on a permanent restraining order, also devoid of probable or other

cause, in further violation of those rights (as urged by the DA defendants from the

commencement of the first prosecution knowing that the arrests and prosecutions of

plaintiff were utterly without cause but, in keeping with the Custom described herein,

seeking to benefit defendants Morgan's and Cary's illegal commercial activities from

First Amendment exposure and refusing, as stated by defendant DelPizzo on behalf of

defendants Vance, the City defendants, including defendants Friedman-Agnifilo, Irwin,

Savur, Darrow and Garnaas-Holmes, and defendants Morgan and Cary that there was *no*

*chance* of a dismissal *regardless of the "merits" of the prosecution* without a permanent

protective order that would preclude photography of defendants Morgan's and Cary's

commercial activities), which false arrests and malicious prosecutions have constituted

nothing short of horrific "domestic renditions" and malicious abuses of the criminal

justice system and process pursuant to an unconstitutional custom, practice, usage and

policy of the Mayor's Office, the Police Department, the Department of Buildings and the

Mayor and his Administration, in particular of defendants Bloomberg (the chief and final

policy-maker who has also otherwise repeatedly ratified, adopted and approved of that

policy and the multiple false arrests and malicious prosecutions of plaintiff pursuant

thereto as to which he had personal knowledge, including from many direct contacts with

plaintiff), Kelly (the chief enforcer of the policy who also had such knowledge from such

direct contacts of the violations and certain future violations of plaintiff's constitutional

rights, aided by, among others, defendants Cokkinos, Houlihan, Stellman and Patino,

acting as defendant Bloomberg's and the other City defendants' agents and with their full

authority and approval and with the repeated ratification and adoption by them of the

conduct of defendants Cokkinos, Houlihan, Stellman and Patino pursuant to that policy,

practice, custom and usage as well as of the conduct of defendants Vance, Friedman-

Agnifilo, Irwin, Savur, Darrow, DelPizzo and Garnaas-Holmes (who are sued solely for

their roles in the false arrests and surveillance of plaintiff and the storming and breaching

of his apartment, Vance only in his individual capacity), Harris (with whom plaintiff also had direct contact making her fully aware of the illegality of the past and threatened arrests of him), LiMandri, Oliver, Battista, the City and defendants John Does 2-15 and Jane Does 1-15, members of the Bloomberg Administration and/or City employees who have had a material role in implementing the policy, and Corporation Counsel, Michael A. Cardozo, the Mayor's and the City's Chief legal counsel, which custom, practice, usage and policy has had the full force of law and the unconstitutional and pernicious purpose and intended result of permitting persistent violations of zoning and public safety and other laws and regulations by certain industries and individuals favored by defendant Bloomberg and his Administration, including by defendants Oliver, Harris, LiMandri and Battista, in particular those industries and persons involved in or with commercial film and/or photography activities in the City and, most particularly, at the properties owned by defendants Morgan and Cary and a neighbor, and of effecting repeated false arrests of anyone, most particularly plaintiff, who exercises his First Amendment right to express his views about the disruptive public commercial activities of public interest on his historic, residentially zoned block of twenty-two years involving indisputable violations of City zoning and public safety and property laws and regulations or who exercises his First Amendment right to document those violations through public photography and videography to petition City officials and agencies for enforcement of those laws by means of such protected communications, as guaranteed by the First Amendment (*e.g.,* plaintiff's online video-petition to the Mayor, Police Commissioner and City officials and agencies uploaded on May 14, 2011, and otherwise furnished to most of the defendants, including defendants Bloomberg, Kelly, Oliver, Battista, LiMandri, Cokkinos, Morgan

and Cary, on or about that date: www.bit.ly/441video, three and one-half months before

plaintiff's August 31, 2011, false arrest on the patently irrational and unsupportable

charge of "stalking") in furtherance of the City's policy, all for the unconstitutional

purpose of retaliating for, and deterring, chilling and punishing the exercise of those First

Amendment rights in order to prevent enforcement of the laws and public awareness of

the violations and lack of enforcement, which custom, usage, practice and policy not only

has, and has had, the full force of law but also said effects (hereinafter, the "Custom",

partially evidenced by **Exhibit "1"** hereto, an October 4, 2012, letter addressed to

plaintiff from the Deputy Commissioner of Enforcement of the Department of Buildings

("DOB"), the City agency charged with enforcing zoning laws, distributed at a meeting at

the Mayor's Office for Film, Theatre and Broadcasting/Media and Entertainment on

October 5, 2012, attended by representatives of the Speaker of the City Council, the

Borough President, Community Board 4 (whose Quality of Life Committee had voted

unanimously to address these zoning and public safety and parking law issues) and other

public officials, as a direct and proximate result of, but years after, plaintiff's initial and

on-going efforts, with the aid of those officials, by means of photographs and filings with

the DOB, and later his video-petition, to have those issues and violations addressed,

including through presentations of photographs evidencing the violations and disruption

caused thereby for which he has been repeatedly falsely arrested, which letter would

certainly not have been provided by the Deputy Commissioner of Enforcement to a

"stalker"; intentionally avoids reference to defendant Morgan's and Cary's property or

their frequent commercial activities that are far from "occasional/incidental" but are

instead aggressively promoted on numerous websites, including, until recently, on

defendant Morgan's own website--*see* www.betsy.com , which she revised to delete any references to location shoots or clients, the principal focus of her site previously, and www.bit.ly/441location--and have involved approximately thirty disruptive "shoot" days in a given year *as part of a business*, as admitted for the first time by defendant Morgan under oath at trial, all of which commercial activities are utterly inconsistent with and in violation of applicable zoning; cites no provision or interpretation of law or other exemption supporting its bald and intentionally vague assertions on behalf of the Mayor, after consultation with many of the other defendants and the most senior members of the Bloomberg Administration (*tellingly, however, excluding the Commissioner and the agency in charge of zoning, namely the City Planning Commission and its Commissioner*) for the purpose of devising a benign statement of the policy, arranged by defendants Oliver and Battista in concert with defendant LiMadri and Deputy Commissioner Timothy Hogan of the DOB with the knowledge and approval of defendants Bloomberg, Harris and Kelly, *in direct response to plaintiff's refusal to surrender his constitutional rights*, in a manner that would appear to "justify" the clear violations of zoning laws by defendant Bloomberg's favored industries and the Bloomberg Administration's permitting same, namely on an "occasional/incidental" basis that does not and can not apply to defendants Morgan and Cary, a policy that the Department of Buildings has also refused to explain just as it has refused to enforce the law and regulations even when the purported Custom does not "apply" and refused to have anyone present at the October 5, 2012 meeting so as to avoid addressing the "rationale" for the Custom; and which letter certainly does not cite, and certainly does not justify, the unstated but critical, unconstitutional component of that custom, usage,

practice and policy to repeatedly effect false arrests of plaintiff, and others, should they appear, who draw attention to the violations of law allowed by favored industries by exercising First Amendment rights, in particular plaintiff; the letter does, however, make abundantly clear both plaintiff's legitimate and constitutionally protected purpose even though the Custom, in particular the effecting of repeated false arrests of plaintiff, has been repeatedly approved, affirmed, adopted and ratified by the City defendants, in particular defendants Bloomberg, Kelly, Harris, Oliver, Limardri and Battista, and by defendants Vance Friedman-Agnifilo, Irwin, Savur, Darrow and Garnaas-Holmes, both individually and in concert with the other defendants, all of whom have approved of and ratified the continuing false arrests and malicious prosecutions of plaintiff with full knowledge not only that those arrests were virtually certain to continue after plaintiff's April 29, 2011, false arrest but also with full knowledge of the past and repeated false reporting and perjury of defendant Morgan and defendant Patino, their agent, and the repeated perjury of defendant Garnaas-Holmes and the suborning of massive perjury by Holmes and assistant district attorney Robert Cannata from defendant Morgan at plaintiff's trial, the withholding of critical *Brady* evidence required to be have been produced long before plaintiff's trial, the unethical efforts of the DA defendants to undermine plaintiff's defense by improper dealings with his counsel, by improper communications with the court and by efforts to mislead judges, all serious prosecutorial misconduct in the name and with the knowledge of defendants Vance and with the knowledge, approval and ratification of defendants Friedman-Agnifilo, Irwin, Savur and Darrow, Bloomberg, Kelly, Harris, Oliver, LiMandri, Battista, Cokkinos, Stellman and

Patino, evidencing both the Custom and the conspiracy among defendants to carry it out;

(v)  the unconstitutional surveillance of plaintiff by defendants' Morgan and Cary, as state actors, advised and acting in concert with, at the urging of and on behalf of defendants Cokkinos, Houlihan, Stellman, Patino,Vance, Friedman-Agnifilo, Irwin, Savur, Darrow, DelPizzo and Garnaas-Holmes, including the installation of cameras to surveil plaintiff upon the advise and urging of said defendants, and surveillance as a result of agreements between defendants Morgan and Cary, on the one hand, and the Brodsky defendants, on the other hand, through defendants O'Connor and Pitre acting within the course and scope of their employment and as agents of the other Brodsky defendants since November, 2010, including on-going monitoring/surveillance by the Brodsky defendants and by defendants Morgan and Cary of plaintiff and the reporting thereof in conversations between defendants Morgan and the Brodsky defendants, including O'Connor and Pitre, as testified to at trial by defendant Morgan, and as state actors, in concert with the City defendants, including defendants Cokkinos, Houlihan, Stellman and Patino, since at least July, 2012, the purpose of which surveillance was to find pretexts to falsely arrest plaintiff to deter the exercise of his First Amendment rights to photograph and videotape disruptive commercial activities of defendants Cary and Morgan that violate zoning on his block and to permit the Brodsky defendants to evict plaintiff from his rent stabilized apartment to benefit both the Brodsky defendants and defendants Morgan and Cary and out of malice and in retaliation for plaintiff's reasonable inquiries concerning serious mold, bedbug and mice infestations and structural issues in the building which the Brodsky defendants went to great lengths to conceal from tenants by repeated misrepresentations and failures to comply with applicable disclosure laws,

including with respect to the serious mold condition in plaintiff's apartment which said defendants refused to address and denied existed without any inspection and only addressed after other tenants had sued them and an expert had rendered an opinion that there had been a serious mold condition in plaintiff's apartment that required immediate remediation, resulting in every room being closed off with plastic; and, as to the structural damage, said defendants delayed more than a year to take action to address mold conditions that had returned in plaintiff's apartment after the extensive and disruptive remediation due to extensive faulty pointing, and then only when, after numerous reasonable requests over at least a year and much patience, that the problems be addressed, particularly given the returning health issues due to mold, the DOB required those structural issues be addressed immediately, which resulted in plaintiff's being criminally stalked by defendant Pitre, acting within the course and scope of his employment, including on surveillance cameras in his own building, in the hallways, on the street and from defendant Pitre's window, causing plaintiff fear and severe emotional distress and depriving him, among other things, of the quiet enjoyment of the premises, to such an extent that the police who responded to a call by plaintiff in connection therewith stated that they would arrest defendant Pitre for stalking if plaintiff pressed charges, said surveillance and stalking of plaintiff constituting a severe intrusion on plaintiff's liberty and sense of safety and causing him severe emotional distress.

(vi)  the prolonged, intentional and unconstitutional withholding of critical medical treatment of plaintiff by defendant Patino during plaintiff's custody after his arrest on July 25, 2012, which had been requested by plaintiff during his custody in a jail cell at the precinct when defendant Patino was casually talking on his phone and otherwise

seemingly unoccupied (resulting in his delayed hospitalization and the increased risk of a

heart attack and undue and life-threatening emotional stress) in deliberate, malicious and

reckless disregard of plaintiff's interests and well-being, particularly after plaintiff had

been  put at deliberate, substantial risk of a heart attack on July 18, 2012;

(b)  based upon supplemental jurisdiction, for substantial compensatory and punitive

damages under state law, including Article 1, Section 12, of the New York State

Constitution, for the conduct alleged above, including the malicious, false arrests of

plaintiff importuned by defendants Cary, Morgan and McKay (based upon their known

criminal false reporting and unreliability, aided and abetted by the Belkin and Brodsky

defendants) without probable or other cause on April 18, 2012 by defendant Patino, and

on July 25, 2012 by defendants Patino and John Doe 1, as agents for and at the direction

and with the knowledge, advice, inducement, approval and/or ratification of defendants

Bloomberg, Harris, Kelly, Cokkinos, Houlihan. Stellman, Vance, Friedman-Agnifilo,

Irwin, Savur, Darrow, DelPizzo, Garnaas-Holmes and defendants John Does 2-15 and

Jane Does 1-15, for the malicious purpose and with the malicious intention of willfully

and wantonly depriving plaintiff of his rights under the laws and Constitution of the State

of New York and intentionally inflicting upon plaintiff and causing him to suffer, as he

did, severe emotional distress and humiliation in deliberate and reckless disregard of his

interests and well-being with respect to the April 18, 2012, and July 25, 2012, false

arrests and the outrageous, terrorist-like storming (and breach) of plaintiff's apartment for

approximately three hours on July 18, 2012, by defendants Patino, Houlihan, Loss, John

Doe 1 and John Does 21-25 and Jane Does 21-25 as agents for and acting at the direction

and with the knowledge, involvement, advice, approval and/or ratification of defendants

Bloomberg, Harris, Kelly, Cokkinos, Houlihan Stellman, Vance, Friedman-Agnifilo, Irwin, Savur, Darrow, DelPizzo, Garnaás-Holmes and defendants John Does 2-15 and Jane Does 1-15, aided and abetted and in conspiracy with the Brodsky defendants, among other things, to intentionally cause plaintiff severe emotional distress, which it did; the malicious prosecutions commenced without probable cause on April 18, 2012 and July 26, 2012 at the behest of and supported by defendants Cary and Morgan; the outrageous surveillance of plaintiff as alleged above; the withholding of medical treatment by defendants in deliberate, malicious and reckless disregard of plaintiff's safety, health and well-being as well as the destruction by defendant Daniel Brodsky, defendant Thomas Brodsky and their defendant companies and employees, as part of their agreement with defendants Morgan and Cary and at their request (as made clear at the plaintiff's trial), of evidence in the Brodsky defendants' possession establishing outrageous conduct of defendants Morgan, Cary and McKay intended to cause plaintiff severe emotion distress, which it did, as to which the Brodsky defendants made repeated false representations to plaintiff of its non-existence, namely a recording on the building's surveillance camera of defendants Morgan's and Cary's employee, defendant McKay, coming to plaintiff's building (owned by Brodsky defendants) on June 11, 2011, and, impersonating a police officer, shouting "NYC Police" into the intercom just after having overheard Plaintiff's telling defendant Anitra (who had permitted defendant McKay over plaintiff's objections to hear the conversation after approaching from behind a tree, how traumatized plaintiff was when his buzzer rang unexpectedly due to his fear of another false arrest, for the outrageous purpose of intentionally causing plaintiff severe emotional distress); said knowing misrepresentations (including by defendants Pitre, Zadrim and Thomas Brodsky,

with the connivance and approval of defendants Daniel Brodsky and O'Connor, including misrepresentations that the recording only lasted a day and had been recorded over as had allegedly been recently confirmed in connection with a bicycle theft, when, as expected, the recording is "good" for a month; and that, in any event, the recorder, although not broken, was not in operation at the time and the disc was blank, as allegedly "confirmed" by an alleged "technician" who, if he looked at the recorder at all, was an employee with no expertise, as later admitted, long after plaintiff's request that the disc/recording be preserved and long after refusing plaintiff or an expert retained by him access to the recorder and disc) and said destruction constituting adoption and ratification as well as aiding and abetting of the outrageous conduct of defendants Morgan, Cary and McKay which was intended to cause and did cause plaintiff severe emotional distress, making defendants Daniel Brodsky and Thomas Brodsky and their defendant companies and employees, including defendants O'Connor, Zadrima and Pitre, all of whom participated in this misconduct, responsible for the substantial injuries and damages caused thereby.

2. The Custom and its effect as well as the conspiracy of defendants to deprive plaintiff's of rights secured under the federal and state constitutions and the laws of the State of New York in carrying it out were further and fully evidenced by the utter lack of due process at plaintiff's criminal trial and the serious, rampant prosecutorial misconduct designed to convict plaintiff at any cost, including the suborning of massive and patently obvious perjury of defendants Morgan, Cokkinos, Stellman and Patino, among other officers, the withholding and tampering with critical *Brady* evidence, attempts to introduce false evidence as well as shocking denials of due process by the judge after plaintiff had been improperly denied a jury trial depriving him of due process and equal

protection of the laws, including the judge's answering a critical question for defendant

Morgan in the angry tone of a protective husband, his re-asking questions that were clear,

as were defendant Morgan's answers, to get her to change the answer, which she did, and

the judge's repeatedly making silent objections to plaintiff's questions without

explanation throughout plaintiff's examinations to disrupt and obstruct them, which

objections one was only aware of when the judge said "sustained" without any objection

having been made by the People, and the judge's excluding critical, admissible evidence

of plaintiff on the specious grounds, including plaintiff's video-petition showing the

disruption from defendant Morgan's and Cary's commercial activities, excluded by the

judge on the preposterous grounds, offensive to the Constitution, that plaintiff's First

Amendment petition and communication (viewed by well over 4,000 people) of critical

relevance to plaintiff's defense of a legitimate purpose and lack of any intent to annoy or

alarm were too "dramatic" and "prejudicial", including the video's use of Beethoven's

Fifth in the background and its use of words like "egregious", "against all reason" and

"showed no concern", an evisceration of the First Amendment to assure conviction at a

time when the protections of the First Amendment were most needed.  (The judge also

precluded any testimony concerning the substantial disruption from defendants'

commercial activities without stating any grounds therefore; and refused to issue a

subpoena to the DOB commissioner with whom plaintiff had dealt on the grounds that his

testimony would be "collateral", or to allow other proof of the illegality of those

activities, and then nonetheless found by implication that defendant Morgan in fact

conducted a business, admitted by her for the first time in the proceedings at trial, the

very thing that plaintiff was attempting to establish and communicate to public officials,

that that business was implicitly legal and that plaintiff had sought to interfere with it by photographing the public commercial activities on his block in connection therewith).

3.  It was also established at trial that after defendant Cokkinos, a high ranking member of the police department who had commanded the 10th precinct (now an Inspector) who, following plaintiff's first false arrest on April 29, 2011, finally met with plaintiff on June 21, 2011, after much urging by plaintiff, including repeated urgent appeals to defendant Kelly explaining the compelling need to avoid further traumatic, unconstitutional arrests which were virtually certain to occur without his and defendant Cokkinos' intervention, when she, after having reviewed all of the complaints against him, told plaintiff that he had committed no offense and could take all the pictures he wanted, shortly thereafter sending him a letter acknowledging her shared concern about problems involving film activities at defendants Morgan's and Cary's property and on the block and offering to assist in addressing them (Exhibit "2"), shortly after which defendant Cary easily arranged a meeting with defendant Cokkinos (the notes of which, like the notes taken by defendant Stellman during plaintiff's meeting, clear *Brady* evidence, have also been withheld as has a critical e-mail from defendant Morgan to defendant Stellman before plaintiff's meeting with him and defendant Cokkinos, never mentioned thereat), including, on information and belief, through John Does 3-15 or Jane Does 1-15 ; and even though defendant Cokkinos had concluded and was fully aware that there were absolutely no grounds to arrest or prosecute plaintiff, nonetheless, as a result of pressure from said defendants, she contacted a *senior* member of the legal department of the police department (John Doe 2), who himself could not justify probable cause and therefore contacted defendant Nitin Savur, the Deputy Chief of all trial divisions of the

District Attorney's Office, who, on information and belief, after consultation with and/or with the knowledge and approval of defendants Vance and his assistants Friedman-Agnifilo (then Chief of all trial divisions), Irwin (then Co-Deputy Chief of all trial divisions), Darrow (then Bureau Chief), DelPizzo (Deputy Bureau Chief) and Garnaas-Holmes (an assistant district attorney assigned to the case), advised defendant Cokkinos, a high-ranking official who must understand what probable cause means, that somehow there was probable cause to arrest and prosecute plaintiff for stalking, after which defendant Cokkinos, having received the "cover" she and the police department had sought arranged with defendants Stellman and Houlhan to have defendant Patino arrest plaintiff on insufficient grounds based upon criminal false reporting of defendant Morgan that was highly unreliable on its face and otherwise utterly insufficient as a matter of law and violative of the First Amendment, confirming what defendant Patino had told plaintiff at the time of his arrest, namely that he wasn't interested in any of the facts in front and available to him, only that the DA wants to prosecute and that he never second guesses the DA and that defendant Morgan had come in and broken down crying, as she did many times during the trial,  which the judge would not allow plaintiff to put it on the record..

4. Indeed, as Detective Ficken had told plaintiff when he came to arrest him for the "intended" charges in the April 18, 2012 complaint which ***never resulted in an arrest*** or prosecution by him (after which defendant Patino <u>did</u> <u>arrest</u> and prosecute plaintiff with respect to the very same investigation ***but on very different allegations*** of defendant Morgan involving the same months but different dates, as to which the police records tellingly and troublingly show <u>no</u> transition from Detective Ficken to defendant Patino,

no explanation as to the change in the charges in the April 18, 2012 complaint, no reasons

why Detective Ficken would not prosecute and *no notes of defendant Patino's interview

with defendant Morgan*, raising the <u>most serious</u> issues of credibility as to the reliability

of defendant Morgan, if she had any at all, which became all the more pronounced at

trial--defendant Morgan, who had told Detective Ficken that plaintiff had taken two

photos of her and her children, not of her house as alleged in the complaint, committed

perjury at trial that she had no idea who Detective Ficken was even though the DA' office

finally produced late into the trial improperly withheld e-mails from defendant Morgan to

Detective Ficken referencing a conversation and asking him in the most casual and

friendly manner, "Hi, Detective Ficken:  I was just wondering if you had gotten around to

arresting Gerard Corsini yet"), which utter unreliability was all the more apparent at the

time of plaintiff's arrest because *defendant Morgan committed perjury* (initially criminal

false reporting before she signed the supporting deposition under oath) *as did defendant

Patino in the April 18, 2012* complaint in stating that plaintiff was standing in front of

her building on March 13, 2012, which they both believed was the basis of the alleged

crime and which the video she took when "stalking" plaintiff on the very day that the first

contempt case was dismissed utterly disproves, as plaintiff had pointed out to defendant

Patino at the time of his arrest and before <u>his</u> perjury, making all the clearer defendant

Patino's conspiratorial involvement as well as the utter lack of probable cause for arrest

and prosecution. (This perjury alone, a fraction of the blatant and incredible perjury

suborned and elicited at trial, was sufficient on its own to create reasonable doubt as a

matter of law as to all charges).

    5.  The documents produced at trial made clear what Detective Ficken had concluded

and stated to plaintiff that supports the existence of both the Custom and a conspiracy, namely that people very high up are behind this--indeed, as he had claimed, but denied on the stand, unnecessarily committing perjury, the complaint was indeed in the process of being drafting long before plaintiff's arrest and long before any "revised decision" with respect to probable cause had been made by the police **who in fact never made any such decision**, including defendants Cokkinos, Houlihan (the head of all detectives at the precinct) and Patino who had informed plaintiff at the time of his arrest that he had relied on the fact that the DA wanted to prosecute and the fact that defendant Morgan had broke down crying and was not interested in anything else available to him--it was also clear that Detective Ficken's perjury was suborned by the DA's office (like that of defendants Cokkinos and Stellman , who evaded based upon alleged memory lapses all questions with respect to the *Brady* notes "critical" to plaintiff's defense) and possibly by Corporation Counsel, which Detective Ficken informed plaintiff had told him that plaintiff had sued him, which was untrue but had clearly influenced his testimony, as intended; indeed, his perjury was not even necessary, as the police reports make clear what he had said and support his conclusion as a veteran of more than twenty years that "people very high up are behind this", which is indeed the case when, among other things, it took plaintiff nearly two months to get a meeting with defendant Cokkinos after repeated appeals to her and defendant Kelly, and, according to her, it took one phone call from defendant Cary to meet with her (most likely with the intervention of Does defendants herein, including Anna Wintour, after which defendant Cokkinos "decided" to reach into the heights of the police department who then reached in to the heights of the District Attorney's Office about a Class B misdemeanor that defendant Cokkinos had

already determined was not chargeable even as a violation.

6. Indeed, defendant Morgan testified that on June 11, 2011, defendant Anitra had told her that, at defendant Morgan's request, she had attempted to get the District Attorney's Office to prosecute plaintiff for stalking, which was "bounced back" in the normal and ordinary course, which clearly led to defendant Cary's taking extreme measures to assure an arrest that no one believed in but which people "in high places" were willing to permit pursuant to the Custom to give defendants Cary and Morgan as well as the City defendants interested in the Custom what they wanted.

7. Defendants Bloomberg, Harris, Kelly, LiMardri, Oliver, Battista, Vance, Friedman-Agnifilo, Irwin, Savur, Darrow, DelPizzo, Garnaas-Holmes, Cokkinos, Stellman, Patino, Loss, John Doe 1, John Doe 2 (the senior person in the legal department with whom defendant Cokkinos spoke)  (a detective in the Police Department), John Does 3-15 and Jane Does 1-15 (officials of the Bloomberg Administration employed by defendant the City) and John Does 16-20 and Jane Does 16-20 (persons or entities with influence with the Bloomberg Administration or City government), although acting within the course and scope of their employment and their official capacities, are all sued herein under Sections 1983 and 1985 in both their official (other than defendant Vance) and individual and personal capacities and all acted, as alleged above, under color of state law, with the intent and for the purpose of depriving plaintiff of established rights secured under the First, Fourth and Fourteenth Amendments of the Constitution of the United States.

8. This Court has jurisdiction pursuant to 28 U.S.C. Sections 1331, 1343 (3) and (4)

and 1367.

9.  Venue in this judicial district is appropriate under 28 U.S.C. Sections 1391(b) in that all of the events that gave rise to the claims herein occurred in this district.

10.  Defendant Elizabeth Morgan at all times alleged herein and material hereto has been an owner with her husband defendant Jonathan Cary of the residential property at 441 West 21st Street in the City, County and State of New York (the "Property" or the "Residence") which is located one building from plaintiff's residence of twenty-one years and which, although zoned for exclusive residential use, was renovated to serve as, and has been extensively promoted, used and licensed by defendants Morgan and Cary as a commercial film and photography studio to the great disruption of the neighborhood, in violation of applicable zoning regulations, in addition to the Property's use as a part-time residence for defendants Morgan and Cary and their family.

11.  Defendant Morgan all times alleged herein and material hereto acted both for herself and as an agent and in concert and conspiracy with defendant Cary, for their mutual benefit and with her agreement, encouragement, inducement, substantial assistance, aid, abetment, approval, consent and ratification.

12.  Defendant Cary all times alleged herein and material hereto acted both for himself and as an agent and in concert and conspiracy with defendant Morgan, for their mutual benefit and with her agreement, encouragement, inducement, substantial assistance, aid, abetment, approval, consent and ratification.

13.  Defendant McKay at all times alleged herein and material hereto was an employee of defendants Morgan and Cary acting within the course and scope of his employment

and/or a person acting at the direction of and in concert with said defendants, under their control, as their agent, for their benefit and with their inducement, agreement, approval, consent and ratification, including in supervising, coordinating and otherwise assisting with commercial film and photography shoots illegally conducted at their residence, and was deliberately retained by defendants Morgan and Cary even though unfit, including after his vicious stabbing of a cab driver in front of plaintiff's residence over a parking dispute prior to the events alleged herein.

14. Defendant Daniel Brodsky, on information and belief, is the controlling member of and/or has effective control over all of the Brodsky defendant companies; he and defendant Thomas Brodsky control and direct all of the Brodsky individual defendants regardless of the organization by which they are employed; and defendant The Brodsky Organization, LLC, holds itself out as the alter-ego of defendants 433 West Associates, LLC (the owner of plaintiff's apartment building) and Urban Associates, LLC (the arm of The Brodsky Organization under the control of defendants Daniel and Thomas Brodsky that manages Brodsky properties, including plaintiff's building), which in turn hold themselves out to be part of The Brodsky Organization; and at all times alleged herein, each of the individual Brodsky defendants acted as members, agents and/or employees of The Brodsky Organization, LLC, 433 West Associates, LLC and Urban Associates, LLC and as agents of , under the control, and at the direction and with the approval of defendants Daniel Brodsky, Thomas Brodsky, O'Connor and Zadrima (all of said persons and entities together with defendant Pitre are collectively referred to in this complaint as the "Brodsky defendants").

15. The block on which defendants Morgan's and Cary's residence (as well as

plaintiff's residence) is located is zoned solely for residential use as reflected on the certificate of occupancy issued for the Property, and defendants Morgan's and Cary's use of their residence since at least 2009 for highly disruptive commercial film and photography shoots has been in violation of New York City laws, rules and/or regulations applicable to the zoning for, and permitted use of, the Property and the certificate of occupancy relating thereto.

16.  Defendants Aaron Shmulewitz and Belkin Burden Wenig & Goldman, LLP ("Belkin Burden"), at all times material hereto have purported to be experts in real estate law, including zoning law, and notwithstanding--indeed because of--the illegality of Morgan's and Cary's extensive and highly promoted business use of their residence for commercial film and photography shoots known to and assisted by them, designed a common plan with and at the request and for the benefit of defendants Morgan and Cary to cover up violations, and to prevent enforcement of, the applicable zoning laws and regulations and substantially aided, abetted, encouraged and substantially assisted defendants Morgan and Cary in carrying out that plan which involved, among other things, threats by defendants Shmulewitz and Belkin Burden of criminal and disciplinary action for photographing public commercial activities that they lied were not taking place and did not involve film or photography shoots but "guests" and "visitors" and "construction workers"; repeated lies of said defendants to cover up those shoots and those illegal activities as well as numerous physical assaults on plaintiff carried out pursuant to that common plan; and advising, aiding and abetting and directing Morgan's and Cary's urging, causing, inducing and importuning plaintiff's false arrests and malicious prosecutions and the criminal false reporting of defendants Morgan and Cary in

connection therewith, including advice as to what to falsely report to the police to "establish" the commission of a crime,.'

17. Defendants Shmulewitz and Belkin at all times material hereto acted in concert with and as the agents of defendants Morgan and Cary and aided, abetted and conspired with and otherwise provided substantial assistance and encouragement to defendants Morgan and Cary in pursuance of said common plan of defendants Shmulewitz' and Belkin's principal design to commit the constitutional and state law violations and the criminal and other unlawful conduct alleged herein, including criminal false reporting and perjury false statements to cover up illegal conduct of their clients, with the full knowledge of its illegality and with the intention of furthering same to harm plaintiff, including, without limitation, by means of knowingly false statements and unfounded, improper and unlawful threats of litigation and disciplinary proceedings and of abusive and malicious criminal prosecution, all for the improper purpose of deterring the exercise of plaintiff's First Amendment and other rights to document by photography public commercial activities and traffic, safety and other violations involving illegal commercial film and photography shoots at defendants Morgan's and Cary's Property, so as to prevent plaintiff from petitioning government agencies to address same.

18. Defendants Morgan, Cary and McKay, and, on information and belief defendants Shumulewiz and Belkin, Burden, Wenig & Goldman ("Belkin"), have known of plaintiff's opposition to and complaints to city officials concerning commercial activities at 441 since 2009, including with respect to a highly disruptive and illegal shoot in August, 2009 and another by Saturday Night Live ("SNL") at 441 on April 15, 2010, with blazing lights into the early morning hours and heavy equipment on the sidewalk

without any permit whatsoever, as to which defendant Morgan claimed through defendant

McKay, who approached plaintiff on the street the next day to tell me that NBC had lied

"to us" about having a permit, which NBC later said was completely false and that

defendant Morgan or her representative had been informed of the lack of a permit and

assured them that "the neighbors would not mind". (Plaintiff arranged for NBC to make

a $2500 contribution to the block association to compensate for the disruption, further

evidencing my "legitimate purpose", and Saturday Night Live apologized profusely for

that disruption and, after viewing plaintiff's video, www. bit.ly/441video, informed

plaintiff that it was shocking and that they would also be very upset if they lived on the

block).

19. The complicity of the City, the Police Department and defendants Bloomberg,

Cokkinos and Kelly in these violations was first apparent to plaintiff when he called the

10th precinct to see if there was a permit for the shoot on file for the SNL shoot and was

told that there was, but when he asked to come to the precinct to see it, was told by the

same person that, in fact, there really was no permit on file, namely that he had lied to

plaintiff, which he did not dispute.

20. When plaintiff then asked that a patrol car go to 441 to ascertain if there was a

permit, plaintiff was flatly told that the police department would never shut down a shoot

even when there was no permit and the use of public property in violation of the law,

without approval of the Mayor's Office, and the officer therefore refused to send out a

patrol car and made no attempt to get a hold of anyone in the Mayor's Office.  He then

put plaintiff on "hold" for any eternity, and when he called him back, after identifying

himself at the request of the operator, he was put on hold again only to be told, quite

unbelievably, that the officer had left. When he called defendant Kelly's office that night

to get action, nothing was done, and no one called him back the next day. This scenario

has played out repeatedly over the years, establishing it as part of policy and of the

Custom of the Bloomberg Administration, so much so that defendant Cokkinos claimed

not to have understood why plaintiff would be concerned about having been lied to by the

police about having the permit for the SNL shoot or not going out to investigate.

21. Similarly, complaints to the Mayor's office, as with a shoot in August, 2009, were

met with intentional misstatements and evasions designed to avoid enforcing the public

property laws that had been violated by NBC and later by further misstatements and

inaction which resulted in what appeared to be a lecture to NBC even though severe

action had been promised by the Mayor's Office if what had been complained about was

true, which the Mayor's Office acknowledged was the case as well as the serious nature

of the violations after having falsely claimed that it had not received plaintiff's e-mail

complaint (a false claim previously made by the Mayor's Office's head of production),

which was sent again by hitting the "reply" button and received, proving that it had been

received when originally sent.

22. Defendants Oliver and Battista, in furtherance of the Custom, have regularly not

only covered up violations of law but also have permitted them, including the illegal

commandeering of parking for shoots and even the posting of fraudulent signage as well

as signs which are flagrantly in violation of its own rules as to which, upon complaint,

they have promised to, but deliberately failed to take any action. On one occasion,

defendant Battista "responded" to a complaint about the illegal commandeering of

parking without a permit which involved lies by those involved to the police who, after

plaintiff had asked them to review the "permit", realized same and required that the cones

and barriers be removed, after which, when the officers departed, the offenders put them

back in place.  Defendant Battista later claimed to have driven on the block after the

cones were put back and to have been unable to locate the illegal reservation of parking,

when the cones were exactly where they were reported to be, which he acknowledged

after plaintiff sent him a photo taken from his window.  This scenario has been repeated

time and time again, with the defendant Commissioners' and their senior staff pretending

not to be aware of the violations and then doing nothing about them after promising to do

so or otherwise covering them up..

    23.  The Mayor's Office has also repeatedly engaged in extreme bad faith in failing to

comply with and in imposing conditions utterly inconsistent with FOIL and otherwise

seeking to evade production of documents with respect  to permits for shoots on

plaintiff's block, including by blatant misrepresentations of its counsel and Deputy

Commissioner, defendant Battista, with the knowledge and approval and at the direction

of defendant Oliver.

    24.  Significantly, both the DOB and the Mayor's Office have refused to produce any

documents relating to the October 4, 2012, letter sent to plaintiff setting forth, in part, the

Custom, including documents relating to how and when the policy came into existence,

where, other than the letter, that Custom is described and who was involved in the

discussions that led up to the letter's being sent to plaintiff and documents relating to said

discussions.

### First Cause of Action

    25.  Plaintiff realleges as if fully set forth herein each and every allegation in

paragraphs 1-24, inclusive, above

26. As a direct and proximate result of the acts alleged above of those defendants alleged herein to have committed or to have conspired to commit acts under the color of state law, custom and policy, plaintiff was intentionally and purposely deprived by said defendants, and each of them, of established rights secured by the First, Fourth and Fourteenth Amendments of the United States Constitution causing him great injury and damage (including severe emotional stress and humiliation) in violation of 42 U.S.C. Sections 1983 and 1985, involving, among other violations, violations of his First and Fourth Amendment rights as a result of the above false arrests, malicious prosecutions and the storming and breaching of his apartment in retaliation for the exercise of his First Amendment rights; the violation of his First, Fourth and Fourteenth Amendment rights as a result of the deliberate withholding of necessary medical care during his custody, the deliberate disregard of the serious medical risks to plaintiff knowingly caused by the storming and breaching of his apartment, the surveillance of plaintiff and the abuse of the process of the court by means of the malicious prosecutions and the issuance therein of protective orders for the collateral purposes of preventing the exercise of plaintiff's First Amendment rights and of forcing him to accept a plea of dismissal with a permanent order precluding such exercise, all in retaliation for the exercise of those rights.

**Second Cause of Action**

27. Plaintiff realleges as if fully set forth herein each and every allegation in paragraphs 1-26, inclusive, above.

28. As a direct and proximate result of the conduct and acts of defendants alleged

above, including their effecting, importuning, aiding and abetting and conspiring to effect plaintiff's false arrests, malicious prosecutions, the storming and breaching of his apartment, the surveillance and stalking of him and the deliberate denial of necessary medical care after creating the conditions and risks requiring same, plaintiff's rights under the law of the State of New York were knowingly, willfully and maliciously violated, causing him substantial damages, injury humiliation and severe emotional distress, including as a result, as alleged above, of defendants' outrageous conduct intended to cause plaintiff severe emotional distress, which it did.

**Third Cause of Action**

29.  Plaintiff realleges as if fully set forth herein each and every allegation in paragraphs 1-28, inclusive, above.

30.  The Brodsky defendants, at the requests of, and in conspiracy with defendants Morgan, Cary and McKay (acting and aided and abetted by the Belkin defendants pursuant to a common plan), as made clear at plaintiff's trial, intentionally destroyed and/or directed, approved and ratified the destruction by defendant Pitre, acting within the scope and course of his employment and as agent for said defendants, of a security disc/tape/recording evidencing defendants Morgan's and Cary's intentional infliction of severe emotional distress on plaintiff by directing and encouraging defendant McKay, as their agent, to impersonate a police officer and come to plaintiff's building owned by The Brodsky Organization and defendant 433 West Associates, LLC, to intentionally cause him severe emotional distress by making plaintiff believe that he was about to be arrested just after defendant McKay had learned how traumatized plaintiff became when his buzzer rang unexpectedly because of his fear of another false arrest, causing plaintiff

extreme emotional distress, aided, abetted and exacerbated by the intentional destruction

of security tapes evidencing that outrageous and illegal conduct and the approval,

adoption and ratification of that destruction and of that outrageous conduct of defendants

Cary, Morgan and McKay by the Brodsky defendants, who also authorized defendant

Pitre and Zadrima to make false representations about the recording to plaintiff, which

they did, and Thomas Brodsky to ratify their misconduct as did defendants Daniel

Brodsky and O'Connor, thereby fully adopting and ratifying the intentional infliction of

severe emotional distress on plaintiff by defendants Cary, Morgan and McKay, making

the Brodsky defendants, and each of them, fully responsible for the damages, including

punitive damages, resulting from defendants Cary's, Morgan's and McKay's intentional

infliction of severe emotional distress, and the additional severe emotional distress which

the Brodsky defendants knew and intended would be caused by their actions.

31.  All of defendants' conduct alleged in the complaint above was outrageous,

malicious and in willful, wanton and reckless indifference and disregard of plaintiff and

his rights and was conducted in extreme bad faith with the intention of causing plaintiff

severe harm, severe emotional distress and humiliation as well as serious injury to and

violations of his fundamental constitutional rights, including the chilling of his First

Amendment rights, without any justification whatsoever, which it did, for the improper

and unconstitutional purpose of retaliating for and deterring (which it accomplished) and

punishing the exercise of plaintiff's constitutional rights and to prevent plaintiff from

seeking redress for their violation and to deprive him of his liberty and due process, in

violation of his rights under the First, Fourth and Fourteenth Amendments, including to

due process and under the laws of the State of New York, and by such illegal means to

severely harm plaintiff to protect the illegal "franchise" conducted by defendants Morgan and Cary, entitling plaintiff, among other things, to substantial compensatory and punitive damages, namely compensatory damages in an amount not less than $15,000,000 and punitive damage in an amount not less than $30,000,000.

**WHEREFORE**, Plaintiff demands judgment against defendants, and each of them, in a sum not less than $15,000,000 for compensatory damages and in a sum not less than $30,000,000 for punitive damages for the intentional, wanton, willful, reckless and malicious harm caused him, plus interest, costs, disbursements and such other and further relief as the Court may deem just and proper.

Dated: February 11, 2014

**PLAINTIFF DEMAND A TRIAL BY JURY OF ALL CLAIMS AND ISSUES SO TRIABLE**

_____
Gerard A. Corsini

_____
Gerard A. Corsini
Plaintiff *pro se*
433 W. 21st St., Apt 9A
New York, NY 10011
212-255-3232
gcorsini@gmail.com



**Robert D. LiMandri**
Commissioner
rlimandri@buildings.nyc.gov

**Timothy Hogan**
Deputy Commissioner of
Enforcement
thogan@buildings.nyc.gov

280 Broadway
Seventh Floor
New York, NY 10007
www.nyc.gov/building

+1 212 442 7158 tel
+212 566 3865 fax

October 4, 2012

Gerard A. Corsini
433 West 21st Street
Apt 9A
New York, NY 10011

Re: 425 W. 21 Street, Manhattan

Dear Mr. Corsini,

I am writing this letter in response to your initial contact with my office regarding film shoots at the above referenced premises. In New York City, it is customary to have occasional/incidental commercial film/photography shoots inside residences. Occasional commercial film/photography shoots are allowed in residences as ancillary or incidental to the principal residence use. We have consulted with our General Counsel's Office, the Mayor's Office of Media and Entertainment, the Mayor's Office of Special Enforcement and the New York City Law Department regarding this matter.

If there is an issue on the block with illegal parking, blocked sidewalks or double parking, it should be addressed to the local police precinct as they are best suited to deal with congestion and access issues. Please contact 311 with any complaints regarding use or occupancy of the residence, and your complaints will be investigated.

Sincerely,

Timothy Hogan
Deputy Commissioner of Enforcement

build safe | live safe

*Exhibit "1"*



POLICE DEPARTMENT
**COMMANDING OFFICER**
**TENTH PRECINCT**
230 West 20th Street
New York, New York  10011

June 24, 2011

Gerard Corsini
433 West 21st Street, Apt. 9A
New York, New York  10011

Dear Mr. Corsini:

I am pleased we had the opportunity to meet in my office on June 21, 2011 and candidly discuss our mutual concerns regarding film production at 441 West 21st Street and locations in that immediately vicinity.  My supervisors and police officers stand ready to assist and impartially enforce applicable Vehicle and Traffic Laws and Quality of Life issues stemming from film production.  It is the intention of the Police Department that all applicable laws be enforced as promulgated by the appropriate agencies.  This includes permits issued by the Mayor's Office of Film and Television Production.  If there are violations observed by responding police officers the situation will be remedied and proper notifications will be made as required.

Lieutenant Kevin Keegan has informed me that he had a follow-up conversation with you on June 22, 2011.  He and Police Officer Richard Stellmann (Community Affairs) will assist me and keep me aware of any problems that may result in the future.

Once again, I want to thank you for your time and it is my sincerest desire that we come to an understanding that best serves you, the community, and all parties involved.

Sincerely,

Elisa A. Cokkinos
Deputy Inspector

COURTESY   •   PROFESSIONALISM   •   RESPECT

Exhibit "2"